UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**STEPHANIE POWE**, Independent
Administrator of the Estate of
**RICK G. ANDERSEN**, deceased,

    Plaintiff,

v.                                                                  Case No. 8:25-cv-00894-WFJ-NHA

**DUSTIN COLKMIRE, CODY SCHOU,
FRANCISCO ROSALES, SGT. JUSTIN
CARPENTER, SGT. CHRISTOPHER
SCHAIRER, LT. MATTHEW LAWSEN**,
and the **CITY OF PLANT CITY**,

    Defendants.
_____/

# ORDER

Before the Court are Defendants Dustin Colkmire, Det. Cody Schou, Francisco Rosales, Sgt. Justin Carpenter, Sgt. Christopher Schairer, and Lt. Matthew Lawsen (jointly, the "Defendant Officers") and City of Plant City's (the "Defendant City") Motions to Dismiss. Dkts. 49, 50, 51, 52, 53, 54, 55. The Defendant Officers, pursuant to Federal Rule of Civil Procedure 12(b)(6), move to dismiss Counts I and II of the Amended Complaint, and further request that the motions be treated as motions for summary judgment. Dkts. 49, 50, 51, 52, 53, 54. The Defendant City, pursuant to Federal Rule of Civil Procedure 12(b)(6), moves this Court to dismiss with prejudice Counts II and III of the Amended Complaint. Dkt. 55. Plaintiff Stephanie Powe, Independent Administrator of the Estate of Rick G. Andersen,

deceased ("Plaintiff"), has responded in opposition, Dkt. 60; S-Dkt. 63, and Defendants replied, Dkts. 67, 68. After careful consideration, the Court grants Defendants' motions to dismiss.

## BACKGROUND[1]

This dispute arises out of the fatal officer-involved shooting of Rick G. Anderson (the "decedent"). Dkt. 35 ¶ 1. On May 7, 2023, the decedent called 911 from a U.S. Post Office location in Plant City, Florida, to express his suicidal intentions. *Id.* ¶¶ 8–9. Officers from the Plant City Police Department ("PCPD") were called to the scene, being advised of an armed individual at the post office who wanted to commit suicide. *Id.* ¶ 8. As the officers began to arrive, the decedent used a handgun to shoot himself under his chin. *Id.* ¶¶ 1, 10. The self-inflicted gunshot fractured the decedent's lower jawbone, perforated his tongue and upper jawbone, continued through the nasal cavity, perforated the frontal sinus, and fractured the ethmoid bone located at the base of his cranium. *Id.* ¶ 15. This extensive wound caused hemorrhaging along the track of the gunshot, including a subarachnoid

---

[1] Ordinarily, when ruling upon a motion to dismiss, a court considers only the "four corners of the complaint" and the exhibits attached to the complaint. *Keating v. City of Mia.*, 598 F.3d 753, 762 (11th Cir. 2010); *see Turner v. Williams*, 65 F.4th 564, 583 n.27 (11th Cir. 2023). If the court considers materials outside of the complaint, the motion to dismiss generally must be converted into a summary judgment motion. *See* Fed. R. Civ. P. 12(b), (d); *SFM Holdings, Ltd. v. Banc of Am. Sec.*, LLC, 600 F.3d 1334, 1337 (11th Cir. 2010). However, under the doctrine of incorporation by reference, a court may consider materials outside the four corners of the complaint when ruling on a motion to dismiss—provided that the materials are "central to the plaintiff's claims" and "undisputed in terms of authenticity," even if they are not "mentioned in" or "attached to" the complaint. *Maxcess, Inc. v. Lucent Techs., Inc.*, 433 F.3d 1337, 1340 n.3 (11th Cir. 2005); *see Johnson v. City of Atlanta*, 107 F.4th 1292, 1299–1300 (11th Cir. 2024). Construing facts in the light most favorable to Plaintiff, the Court recites the facts based on the allegations within the Amended Complaint. Dkt. 35. Additionally, the Court will consider the surveillance footage submitted by Defendants, Dkt. 28 (Front Door); Dkt. 28 (Front Parking), as this footage is undisputed material that is central to Plaintiff's claims. In its discretion, the Court considers all present motions as motions to dismiss and declines to treat the Defendant Officers' motions to dismiss as motions for summary judgment.

hemorrhage on the frontal convexities of the brain. *Id.* After shooting himself, the decedent bled from under his chin while sitting collapsed in a corner between a chain link fence and the east wall of the post office. *Id.* ¶¶ 1, 16. The decedent was still alive at this point, although he continued to bleed from his gunshot wound and had heavy, labored breathing. *Id.* ¶ 14.

As Defendant Colkmire and another officer arrived at the scene, they heard the singular discharge of the decedent's handgun. *Id.* ¶ 10. Defendant Colkmire then called in "shots fired," requesting further assistance. *Id.* ¶ 11. Defendant Carpenter was the next officer to arrive. *Id.* ¶ 12. Once Defendant Colkmire took up a ballistic shield, the three officers formed a stack behind it and began to approach the decedent. *Id.* ¶¶ 13, 17. Defendants Rosales and Schou then arrived, taking positions to the left and right of Defendant Colkmire, respectively. *Id.* ¶¶ 17, 18. Defendant Lawsen arrived, also joining the stack of officers approaching the decedent. *Id.* ¶ 18. After Defendant Schairer arrived, he took a position behind a tree 60–70 feet from the decedent. *Id.* ¶ 20.

At this time, the decedent still held the handgun in his right hand. *Id.* at 21. The Defendant Officers spent the next 1 minute 36 seconds calling out commands consisting of "don't reach," "hands up," and "drop it." Dkt. 28 at 03:09–04:45 (Front Door); Dkt. 28 at 02:09–03:45 (Front Parking). After this, Defendant Carpenter directed another officer to utilize less than lethal bean bag rounds, two of which struck the decedent in the chest and caused him to drop the handgun to his left. Dkt.

3

35 ¶¶ 21–23. The decedent then reached for the gun with his left hand, but was struck in the left shoulder by another bean bag round. *Id.* ¶ 24. Within a span of three seconds, the decedent was struck by the final beanbag round while reaching for the gun, there were sudden and loud orders to "drop the gun," and the Defendant Officers opened fire before the decedent picked up the gun.[2] *Id.* ¶¶ 24–32; Dkt. 28 at 04:55–04:58 (Front Door); Dkt. 28 at 03:55–03:58 (Front Parking). Ultimately, the decedent was shot a total of 23 times, Dkt. 35 ¶ 32, and "died as a result of the multiple gunshot wounds inflicted by the Defendant Officers." *Id.* ¶ 34.

After this, Plaintiff filed suit against the Defendants. Dkt. 1. In response to Defendants' initial motions to dismiss, Dkts. 20, 21, 22, 23, 24, 25, 26, 27, Plaintiff filed an amended complaint, Dkt. 35. Plaintiff's Amended Complaint alleges two federal claims: a 42 U.S.C. § 1983 claim against the Defendant Officers (Count I) and a *Monell* claim against the Defendant City (Count III). *Id.* Additionally, the Amended Complaint includes a state law claim under the Florida Wrongful Death Act against both the Defendant Officers and the Defendant City (Count II). *Id.* Defendants then each filed motions to dismiss, with the Defendant Officers seeking

---

[2] This is contrary to the factual assertions of the Defendant Officers—however, the Court construes all facts in the light most favorable to the plaintiff at this stage. *See* Dkt. 49 at 15 ("Rosales then witnessed the man, unphased by the non-lethal bean bag rounds, point the gun directly at the officers"); Dkt. 50 at 16 ("He then saw Andersen pick up the object and move it in a motion that caused it to be aimed at the stack of his fellow officers"); Dkt. 51 at 16 ("Andersen moved the gun from the left side of his body to the right side of his body, aiming the weapon at Schou and his fellow officers"); Dkt. 52 at 16 ("Despite having been struck by multiple bean bag rounds, the man picked up his gun and pointed it directly at the stack of officers"); Dkt. 53 at 16 ("The man pointed his gun directly at the stack of officers"); Dkt. 54 at 16 ("Lawson saw the man put the gun down, thinking he might surrender, but he picked it back up and pointed it directly at the stack of officers").

4

dismissal, to be treated as summary judgment, of Counts I and II, Dkts. 49, 50, 51, 52, 53, 54, and with the Defendant City seeking dismissal with prejudice of Counts II and III, Dkt. 55.

## LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires a short and plain statement of the claim showing that the plaintiff is entitled to relief to give the defendant fair notice of the claims and grounds. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). The plaintiff is required to allege "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* (citation omitted). In considering a Rule 12(b)(6) motion to dismiss, the court must construe the facts in the light most favorable to the plaintiff. *Wiersum v. U.S. Bank, N.A.*, 785 F.3d 483, 485 (11th Cir. 2015). A complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face" to survive a motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009) (citation modified). However, "[c]onclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal." *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1262 (11th Cir. 2004) (citation omitted).

# DISCUSSION

## I. Count I: Section 1983 – Fourth Amendment Excessive Force Claim

The Defendant Officers seek to dismiss Count I, which alleges "deliberate and malicious deprivation of [the decedent's] Constitutional rights against excessive force, as guaranteed by the Fourth Amendment of the Constitution and made applicable to the states by the Fourteenth Amendment." Dkt. 35 ¶ 36. Each of the Defendant Officers argue that the claim must be dismissed because they are entitled to qualified immunity. Dkt. 49 at 18; Dkt. 50 at 20; Dkt. 51 at 19; Dkt. 52 at 18; Dkt. 53 at 19; Dkt. 54 at 18.

The defense of qualified immunity shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, (1982); *Loftus v. Clark-Moore*, 690 F.3d 1200, 1204 (11th Cir. 2012). "[E]ntitlement to qualified immunity is for the court to decide as a matter of law."[3] *Simmons v. Bradshaw*, 879 F.3d 1157, 1163 (11th Cir. 2018).

To receive qualified immunity, an official must first "establish that he or she acted within the scope of discretionary authority when the allegedly wrongful acts

---

[3] Additionally, "[a]s an immunity from suit, qualified immunity is *not* . . . 'more appropriately resolved at the summary judgment sta[g]e or later in the proceedings.' To the contrary, [Eleventh Circuit] precedents mandate its resolution 'at the earliest possible stage in litigation.'" *Miller v. Palm Beach Cnty. Sheriff's Off.*, 129 F.4th 1329, 1334 (11th Cir. 2025) (quoting *Jordan v. Doe*, 38 F.3d 1559, 1565 (11th Cir. 1994)).

6

occurred." *Robinson v. Sauls*, 46 F.4th 1332, 1340 (11th Cir. 2022) (citation modified). Once this showing is made, the burden shifts to the plaintiff to show that "(1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." *Id.* at 1340–41 (quoting *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004)).

As an initial matter, there is no dispute that the Defendant Officers were acting within the scope of their discretionary authority as Police Officers for PCPD. Dkt. 35 ¶ 6. Indeed, Plaintiff acknowledges that the Defendant Officers "were at all times material hereto, duly appointed Plant City Police Officers employed by the City of Plant City acting in the capacity of sworn law enforcement officials acting under color of law." *Id.* As such, Plaintiff has the burden to show that the Defendant Officers violated the decedent's Fourth Amendment right against use of excessive force and that this right was clearly established at the time of the alleged violation.

      a. *Fourth Amendment Violation*

To determine whether the Defendant Officers utilized constitutionally prohibited force, the Court must consider whether an "objectively reasonable officer in the same situation could have believed the use of force was not excessive." *Brown v. City of Huntsville*, 608 F.3d 724, 738 (11th Cir. 2010); *see Graham v. Connor*, 490 U.S. 386, 396 (1989) ("The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."). In reviewing reasonableness, the Court must further

7

consider "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." *Franklin v. Popovich*, 111 F.4th 1188, 1195 (11th Cir. 2024) (quoting *Graham*, 490 U.S. at 396).

Taking Plaintiff's recitation of the facts as true, neither the first nor third *Graham* factor would suggest that the Defendant Officers' deadly force was reasonable. Regarding the first factor, the decedent's initial discharge while attempting suicide does not warrant deadly force, especially as the intended victim was limited to himself. *See Teel v. Lozada*, 826 F. App'x 880, 886 (11th Cir. 2020) (citation modified) (quoting *Mercado v. City of Orlando*, 407 F.3d 1152, 1157 (11th Cir. 2005)) ("Because this situation does not involve a criminal arrest, our facts do not fit neatly within the *Graham* framework. Indeed, because Florida does not recognize attempted suicide as a crime, it is impossible for this Court to measure the severity of the crime at issue."). Further, regarding the third factor, Plaintiff asserts that the decedent was incapable of either resisting or evading arrest due to his "extensive self-inflicted gunshot injury and his position on the ground wedged between a chain link fence and wall." Dkt. 35 ¶¶ 16, 25; S-Dkt. 63 at 12. At the heart of this qualified immunity analysis is the second *Graham* factor—whether the decedent posed an "immediate threat to the safety of the officers or others." *Graham*, 490 U.S. at 396. This is the factor upon which this claim will turn.

8

The facts presented by Plaintiff are analogous to those of *Robinson v. City of Huntsville*,[4] where officers responded to an individual who suffered from PTSD and a traumatic brain injury, and was reported to be armed with a gun. No. 21-13979, 2022 WL 3867584, at *4 (11th Cir. Aug. 30, 2022). Like the present case, the individual failed to comply with commands to put her hands up—instead, she reached for her gun. *Id.* "[T]he officers reasonably perceived that [the individual's] reaching for a gun posed a threat of serious physical harm," and thus used "deadly force to protect themselves and each other." *Id.* Citing to published precedent, it was found that the use of deadly force in this case "did not violate the Fourth Amendment." *Id.* (citing *Shaw v. City of Selma*, 884 F.3d 1093, 1100 (11th Cir. 2018); *Garczynski v. Bradshaw*, 573 F.3d 1158, 1168 (11th Cir. 2009)).

In *Shaw* and *Garczynski*, both cited in *Robinson*, the Eleventh Circuit held that a sufficient immediate threat to the safety of the responding officers—in conjunction with a failure to comply with repeated commands—can warrant the use of deadly force even if the first and third *Graham* factors are not met. *Shaw*, 884 F.3d at 1099–1101; *Garczynski*, 573 F.3d at 1169–70. In both cases, the individual had not committed a crime (first *Graham* factor) and was not attempting to escape (third *Graham* factor). *Id.* The immediate threat in *Shaw* was that a mentally ill individual failed to comply with repeated commands while advancing on the officers

---

[4] The Court does not rely on unpublished opinions as binding precedent; however, they may be cited when the Court finds them persuasive on a particular point. *See McNamara v. GEICO*, 30 F.4th 1055, 1060–61 (11th Cir. 2022).

with an edged weapon. 884 F.3d at 1099–1101. The immediate threat in *Garczynski* was that a suicidal individual refused to comply with repeated commands and began to point his gun in the direction of the officers. 573 F.3d at 1169–70 (emphasis added) ("These factors, *even assuming that [the decedent] never pointed the gun at the officers*, provided a sufficient basis for the officers reasonably to believe that [the decedent] posed an immediate risk of serious harm to them."). Paralleling the present case, both Eleventh Circuit cases involved an individual with limited capacity who did not comply with orders from officers, Dkt. 28 at 03:09–04:45 (Front Door); Dkt. 28 at 02:09–03:45 (Front Parking), and instead proceeded to take an action that a reasonable officer would perceive as posing an immediate threat warranting the use of deadly force. *See* Dkt. 35 ¶ 24.

On the other hand, the alleged facts are distinct from those in *Perez v. Suszczynski*, where the individual previously possessed a handgun while interacting with police, but it was removed from his person and thrown about ten feet away before he was shot in the back "execution-style" by the officer. 809 F.3d 1213, 1217 (11th Cir. 2016). It was held that "a person who at one time had a gun, but clearly has had the gun removed, is no different than any other unarmed individual." *Id.* at 1220. The key difference here is that, in *Perez*, the handgun was removed well outside the reach of the individual, whereas in the present case, the decedent was able to reach for the handgun after it was dropped. Dkt. 35 ¶ 24.

10

Granting that the "mere presence of a gun or other weapon is not enough to warrant the exercise of deadly force and shield an officer from suit," *Perez*, 809 F.3d at 1220, the Eleventh Circuit has held that an officer is "not required to wait and hope for the best" when an individual's gun is "available for ready use." P*owell v. Snook*, 25 F.4th 912, 922 (11th Cir. 2022) (quoting *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010)). This holds true even when the individual "has not drawn his gun." *Id.*

Although the Amended Complaint alleges that two of the less than lethal bean bag rounds struck the decedent and effectively disarmed him, Dkt. 35 ¶¶ 22–23, Plaintiff also acknowledges that the decedent then "reached for the gun with his left hand." *Id.* ¶ 24. The decedent reached for his gun immediately before the Defendant Officers fired the final bean bag round and fatally shot him—all within three seconds. *Id.* (alleging that the decedent was struck by the final bean bag round, but not that he was subdued or prevented from reaching); *Id.* ¶¶ 25–32 (describing the extent of the shooting); Dkt. 28 at 04:55–04:58 (Front Door); Dkt. 28 at 03:55–03:58 (Front Parking). The acknowledgment that the decedent reached for the gun directly before being shot is consistent with the surveillance video, which records the nearly simultaneous sequence of the final bean bag round being fired, sudden commands to "drop the gun," and the fatal gunfire. Dkt. 28 at 04:55–04:58 (Front Door); Dkt. 28 at 03:55–03:58 (Front Parking).

11

Even accepting as true that the Defendant Officers fatally shot the decedent before he picked up the gun, the Court finds that the decedent's reaching for the handgun—after being struck with multiple bean bag rounds and repeatedly told "don't reach," "hands up," and "drop it"—created an immediate threat to the officers' safety, warranting their split-second decision to use deadly force. *Shaw*, 884 F.3d at 1097–98; *Garczynski*, 573 F.3d at 1169; *Robinson*, 2022 WL 3867584, at *4; *see also Long v. Slaton,* 508 F.3d 576, 581 (11th Cir. 2007) ("Even if we accept that the threat posed by [the decedent] to [the officer] was not immediate, . . . the law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop [the decedent]."). Plaintiff's assertion that the decedent "did not pose a deadly threat to any reasonably trained officer," Dkt. 35 ¶ 16, is refuted by the admission that the decedent was holding the handgun when approached, *id.* ¶ 21, and then again "reached for the gun" after he was forced to drop it, *id.* ¶ 24.

Therefore, construing all facts in the light most favorable to Plaintiff, the Court finds that an "objectively reasonable officer in the same situation," *Brown*, 608 F.3d at 738, could have utilized deadly force—thus, the decedent's Fourth Amendment right against excessive force was not violated.

  b. *Clearly Established Right*

To defeat a claim of qualified immunity, Plaintiff must establish both that there was a violation of his constitutional rights and that the right was "clearly established"

at the time of the Defendant Officers' alleged violation. *Robinson*, 46 F.4th at 1340. Because the Court has concluded that Defendant did not violate Plaintiff's constitutional rights, there is no need to address the "clearly established" prong. *Id.*

In sum, the Defendant Officers did not utilize constitutionally prohibited force, as the Court finds that an "objectively reasonable officer," when faced with an individual reaching for a handgun after failing to comply with commands, could have believed the use of deadly force was not excessive. *See Brown*, 608 F.3d at 738. The "clearly established" nature of Defendant's actions is thus immaterial, as there was no constitutional violation. Even viewing the allegation of excessive force in the light most favorable to Plaintiff, the Court finds that the Defendant Officers are entitled to qualified immunity. Therefore, Plaintiff has failed to state a claim upon which relief can be granted regarding Count I, and the Court grants the Defendant Officers' motion to dismiss the § 1983 excessive force claim.

## II.  Count III: *Monell* Claim

The Defendant City seeks to dismiss Count III, which alleges that the Defendant City failed to act upon known "systemic deficiencies in training and oversight procedures," which "constituted a policy, practice or custom under [*Monell*], and was the moving force behind [the decedent's] death." Dkt. 35 ¶¶ 50–54. The Defendant City argues that the claim must be dismissed because "Plaintiff has failed to sufficiently plead a § 1983 claim against the City by failing to specifically identify the claimed Constitutional rights at issue, the City's

policymakers or officials who speak with policymaking authority, and the official policy or pattern of behavior at issue." Dkt. 55 at 15.

Generally, municipalities—like the City—cannot be held liable on a theory of *respondeat superior* or for acts committed by their officers. *See Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 691, 693–94 (1978). Instead, municipal entities may be held liable under § 1983 only where "action pursuant to official municipal policy of some nature caused a constitutional tort." *Id.* at 691. This standard requires a plaintiff to show "(1) that his constitutional rights were violated; (2) that the municipal office had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." *Land v. Sheriff of Jackson Cnty.*, 85 F.4th 1121, 1129 (11th Cir. 2023) (citation modified) (quoting *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004)). The Court need only consider the first prong, as it is dispositive.

Plaintiff alleges that the constitutional violation underlying the *Monell* claim is a violation of the Fourth Amendment, and the Court construes it to refer to the same excessive force allegation brought in Count I.[5] The Court affirms that "a *Monell* claim is derivative of—and so requires—an actual constitutional violation

---

[5] Count III of Plaintiff's Amended Complaint makes various references to "constitutional violations," Dkt. 35 ¶¶ 51, 52, 53, but never specifies the constitutional right that was alleged violated. Paragraph 45 of Count III states that Plaintiff "repeats and realleges Paragraphs 1 through 34 as though fully set forth herein." Although Paragraphs 1 through 34 reference that this action is brought "pursuant to the Fourth and Fourteenth Amendments to the United States Constitution," a specific constitutional violation is never mentioned in relation to the *Monell* claim. The Court chooses to construe Count III liberally, as referring to the excessive force allegation brought in Count I.

14

by an officer. If a plaintiff cannot establish an actual constitutional violation by an officer, the plaintiff's *Monell* claim fails at step one. Put differently, when a plaintiff fails to establish an underlying constitutional violation, [courts] can dismiss the plaintiff's claims against the local government (or local government entity) as a matter of law." *Cunningham v. Cobb Cnty., Ga.*, 141 F.4th 1201, 1213 (11th Cir. 2025) (citation modified) (quoting *Land*, 85 F.4th at 1129).

The Court previously found that no underlying constitutional violation was committed by of the Defendant Officers. The lack of an underlying constitutional violation is dispositive of Plaintiff's *Monell* claim. *See City of L.A. v. Heller*, 475 U.S. 796, 799 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point."); *Swinford v. Santos*, 121 F.4th 179, 191 (11th Cir. 2024) ("[B]ecause we determine that no underlying constitutional violation occurred, . . . [the plaintiff's] *Monell* claim against the county fail[s] as a matter of law."); *Paez v. Mulvey*, 915 F.3d 1276, 1291 (11th Cir. 2019) ("[B]ecause [the officers] committed no constitutional violations, their supervisors . . . cannot be found liable . . . for violating § 1983."); *Knight ex rel. Kerr v. Mia.-Dade Cnty.*, 856 F.3d 795, 821 (11th Cir. 2017) ("There can be no policy-based liability . . . when there is no underlying constitutional violation.").

Thus, construing all facts in the light most favorable to the plaintiff, the Court finds that Plaintiff's *Monell* claim fails at the first prong, and declines to consider the further elements. Therefore, Plaintiff has failed to state a claim upon which relief can be granted regarding Count III, and the Court grants the Defendant City's motion to dismiss the *Monell* claim.

### III.   Count II: Florida Wrongful Death Act Claim

With Counts I and III dismissed, only the state law claim under the Florida Wrongful Death Act remains. *See* Fla. Stat. § 768.16. Pursuant to 28 U.S.C. § 1367(c)(3), a district court may decline to exercise supplemental jurisdiction over a claim if the court has "dismissed all claims over which it has original jurisdiction." *See Silas v. Sheriff of Broward Cnty., Fla.*, 55 F.4th 863, 866 (11th Cir. 2022) ("Although the district court has discretion, concerns of federalism—namely, of federal courts of limited jurisdiction weighing in on state law—counsel in favor of dismissing state-law claims after the federal claims are dismissed."); *Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1089 (11th Cir. 2004) ("We have encouraged district courts to dismiss any remaining state claims when, as here, the federal claims have been dismissed prior to trial."). Such is the case here, as only non-diverse state-law claims remain. At this point, the Court declines to exercise its supplemental jurisdiction over Count II and dismisses this remaining count without prejudice.

## CONCLUSION

Accordingly, it is hereby **ORDERED** and **ADJUDGED** that:

1. The Defendant Officers' Motions to Dismiss, Dkts. 49, 50, 51, 52, 53, 54, is **GRANTED**. The Fourth Amendment excessive force claim under § 1983 (Count I) is **DISMISSED with prejudice**, and the Florida Wrongful Death Act claim (Count II) is **DISMISSED without prejudice**.

2. The Defendant City's Motion to Dismiss, Dkt. 55, is **GRANTED**. The *Monell* claim (Count III) is **DISMISSED with prejudice**, and the Florida Wrongful Death Act claim (Count II) is **DISMISSED without prejudice**.

   **DONE AND ORDERED** at Tampa, Florida, on November 14, 2025.

   */s/ William F. Jung*
   **WILLIAM F. JUNG**
   **UNITED STATES DISTRICT JUDGE**

**COPIES FURNISHED TO:**
Counsel of Record